IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff**,

          **v.**               **Criminal No.** 20-019 (FAB)

JULIA BEATRICE KELEHER [1],

    **Defendant**.

## OPINION AND ORDER

Defendant Julia Beatrice Keleher ("Keleher") moves to change the venue of the criminal case against her. (Docket No. 73.)[1] Alternatively, Keleher requests that the Court schedule the trial in this case as soon as the COVID-19 pandemic allows. (Docket No. 118 at p. 13.) As discussed below, the motion to transfer is **DENIED** and the scheduling request is **NOTED**.

### I. Background

Keleher was the Secretary of Education in Puerto Rico from approximately January 2017 to April 2019. (Docket No. 3 at p. 1.)

In July 2019, Keleher was indicted in a case which was assigned to Judge Pedro A. Delgado-Hernández. (Criminal No. 19-431, Docket No. 3.) The indictment was recently superseded. (Criminal No. 19-431, Docket No. 368.)

---

[1] All docket references are to Criminal No. 20-019 unless otherwise indicated.

Keleher moved to change the venue of that case. (Criminal No. 19-431, Docket No. 172.)  Judge Delgado-Hernández denied the motion. (Criminal No. 19-431, Docket No. 255.)

In January 2020, Keleher was indicted in this case. (Docket No. 3.)  The charges include conspiracy to commit honest services fraud, wire fraud, and federal program bribery.  Id.

## II. Keleher's Motion to Transfer Venue

Keleher wants the Court to transfer this case because of what she views as public animosity against her, prevalent antagonistic media about her, and a predisposition among Puerto Ricans to find her guilty.[2]  (Docket No. 73.)  If the Court disagrees, Keleher wants the trial to be held as soon as possible to protect her speedy trial rights.  (Docket No. 118 at p. 13.)

Keleher does not believe that *voir dire* will be sufficient to impanel an impartial jury in Puerto Rico.  (Docket No. 118 at pp. 4-5.)  And she contends that *voir dire* is not a prerequisite

---

[2] Keleher cites approximately forty media reports.  See Docket No. 73 at *passim*.  Most of the reports are in the Spanish language.  Roughly six are in the English language, and Keleher provides certified translations of approximately eight reports and two interviews.  See Docket Nos. 114, 120.  The Court only considers the English-language reports, and those for which certified translations have been submitted.  Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008); United States v. Tribble, Criminal No. 19-541, 2020 WL 3485824, at *12 (D.P.R. June 26, 2020) (Besosa, J.) (refusing to consider media articles in the Spanish language on review of a motion to transfer a criminal case); see also Docket No. 106 (permitting Keleher additional time to file English translations and warning that the Court would only consider materials in the English language).

to transferring a criminal case. Id. at p. 1. Additionally, Keleher argues that even if transfer is not required, the Court should transfer the case to avoid the possibility that an insufficient *voir dire* will result in a reversal on appeal. Id. at p. 12.

Keleher contends that the foundation of the prejudice against her is public sentiment concerning her tenure as Secretary of Education. (Docket No. 73 at pp. 1–3.) She notes that her income and decisions as Secretary were unpopular and widely reported. Id.; see Docket No. 114, Ex. 4 (English-language translation of media report about Keleher's salary). Keleher's decision to close schools was described to a Puerto Rico news outlet as a "manmade disaster" caused by "Hurricane Keleher." (Docket No. 73 at p. 2 (citing recorded interview).)

Public disapproval reached a higher level, Keleher says, with news of criminal allegations against her in the case before Judge Delgado-Hernández. Id. at pp. 3–4; see generally Criminal No. 19-431. According to Keleher, she "was characterized as corrupt, a thief, and an embarrassment to Puerto Rico." (Docket No. 73 at p. 4.) She observes that those who were opposed to her tenure as Secretary claimed vindication, id. at pp. 4–5; see Docket No. 114, Ex. 5 (English-language translation of media report discussing reaction of teachers' association), and that she was likened to a

former Secretary of Education, (Docket No. 73 at pp. 4-5); see
Docket No. 114, Exs. 6, 9 (English-language translations of a
broadcast and a media article comparing Keleher and the former
official).

Keleher also attacks the nature of the publicity surrounding
the allegations in Criminal No. 19-431.  She states that news
stories linked her to activities unrelated to the indictment
against her. (Docket No. 73 at p. 4.)  She contends that "[m]any
of the news reports were founded on little more than speculation,"
citing in support one English-language article that predates the
criminal allegations and criticizes other outlets' reporting on an
issue over which Keleher presided as Secretary.  Id. (citing
Devorah Levy-Pearlman, The Puerto Rico-Josephson Institute
Scandal, in Context, https://pasquines.us/2018/06/08/the-puerto-
rico-josephson-institute-scandal-in-context/ (June 8, 2018)).  The
former United States Attorney for the District of Puerto Rico and
the former Governor of Puerto Rico, Keleher observes, went on
television to discuss the charges against Keleher.  Id. at pp. 6-
7 (citing English-language report discussing Governor's
statement).  She notes that the former United States Attorney
called the charges "reprehensible" and the former Governor stated
that they were a "disgrace."  Id.

"Most importantly," Keleher asserts, is that the indictment against her in Criminal No. 19-431 was publicized at the same time as a public outcry against the former Governor dominated local media.  Id. at pp. 7, 14 (citing three English-language articles discussing the outcry).  Keleher believes that she "was the face of corruption in the [Governor's] administration." Id.; see Docket No. 114, Ex. 1 (English-language translation of protestors' signs).  Keleher further alleges that she was assaulted and accosted by a large mob outside the federal courthouse in San Juan, Puerto Rico when she made her initial appearance for Criminal No. 19-431.  (Docket No. 73 at p. 6); see Docket No. 114, Ex. 7 (English-language translation of media report discussing her initial appearance).

The criminal allegations in this case, Keleher declares, "served further to heighten the public's animosity" and "all news outlets in the island went into a frenzy." Id. at p. 8.  Keleher points out these allegations came amidst the closure of schools as a result of a series of earthquakes in Puerto Rico.  Id. at p. 9 (citing English-language article discussing structural defects in Puerto Rico schools).  Keleher highlights a comment from a labor leader stating that she was the largest earthquake to pass through the Department of Education.  Id. at pp. 9-10; see Docket No. 114, Ex. 8 (English-language translation of media report).  She notes

that the current United States Attorney for the District of Puerto Rico said that corruption continues to erode trust between government officials and citizens and that Keleher exploited her position to benefit herself.  (Docket No. 73 at p. 9.)  She also points to comments from two representatives of teachers' organizations.  Id. at pp. 9-10.

Keleher believes that negative media reports will continue. She states that she continues to be associated with other allegations about the government.  Id. at pp. 10-11; see Docket No. 114, Ex. 2 (English-language translation of social media post linking Keleher with other allegations).  For instance, she points to a recent English-language article discussing her case.  (Docket No. 118 at pp. 8-9 (citing English-language article).)  She notes that her solicitation of donations to pay for her defense was publicized.  (Docket No. 73 at p. 18); see Docket No. 114, Ex. 10 (English-language translation of media report discussing her search for donations).  And she considers it likely that her name will be invoked during elections in Puerto Rico.  (Docket No. 73 at pp. 20-21.)

Keleher builds her legal argument for a change of venue on the factors identified by the United States Supreme Court in Skilling v. United States, 561 U.S. 358, 382-84 (2010).  These factors are the size and characteristics of the community, the

content of publicity, the length of time between reporting and the
trial, and whether the jury's verdict indicates bias.  Id.

     With respect to the size and characteristics of the community,
Keleher contends that Puerto Rico's federal jury pool consists of
approximately 270,000 people.  (Docket No. 73 at p. 13.)  This is
because, she notes, one scholar estimates that only 10% of Puerto
Ricans speak English at a proficiency adequate for federal jury
service, id. (citing Jasmine B. Gonzáles-Rose, The Exclusion of
Non-English-Speaking Jurors:  Remedying a Century of Denial of the
Sixth Amendment in the Federal Courts of Puerto Rico, 46 Harv.
C.R.-C.L. L. Rev. 497, 497 (2011)), and according to 2018 census
data there are approximately 2,700,000 adults in Puerto Rico, id.
at p. 13 n.30.  She asserts that other jurisdictions in the first
circuit have larger jury pool populations based on the number of
registered voters in those jurisdictions.  Id. at pp. 13–14.
Keleher believes that finding an impartial jury is more likely in
those other first circuit jurisdictions because of the larger
assumed size.  Id. at p. 14.  Keleher also figures an impartial
jury would be easier to find in those jurisdictions because Puerto
Rico is said to be "'a compact, insular community' that is 'highly
susceptible to the impact of local media.'"  (Docket No. 118 at
p. 3 (quoting United States v. Casellas-Toro, 807 F.3d 380, 386
(1st Cir. 2015).)

The jury pool is prejudiced against her, Keleher alleges, because of a history of corruption in Puerto Rico. (Docket No. 73 at p. 14.) Keleher states that Puerto Ricans' frustration with that corruption "reached a fever pitch" at the same time the indictment against her was handed down in Criminal No. 19-431. Id. Keleher asserts that she "became a talisman of the movement." Id.

Keleher also points to a survey she commissioned concerning the allegations in Criminal No. 19-431. Id. at p. 21. That survey found that approximately 85% of English-speaking Puerto Rico respondents were familiar with the charges against Keleher in Criminal No. 19-431. (Criminal No. 19-431, Docket No. 172, Ex. 1 at p. 13.) Of those familiar with the case, 63% could recall Keleher's name when asked to identify the former Secretary of Education, id., while two-thirds saw a television program about the case, roughly 55% saw an internet report, and about the same proportion came across a report from newspapers, radio, or conversations, id., Ex. 1 at p. 16. Of all survey respondents, 65% thought Keleher was definitely or probably guilty while the remainder thought she was not guilty, did not know whether she was guilty, or were unfamiliar with the case. Id., Ex. 1 at p. 17.

Keleher also strives to distinguish this Court's decision in United States v. Tribble, Criminal No. 19-541, 2020 WL 3485824

(D.P.R. June 26, 2020) (Besosa, J.).  In _Tribble_, the defendant's principal argument for transfer concerned alleged prejudice arising from something besides the accused crime.  See _id._ at *2. The Court denied the defendant's motion for transfer.  See _id._ at *1.  According to Keleher, _Tribble_ is inapposite because of the "recent and ongoing history of corruption" in Puerto Rico and the attendant publicity, of which Keleher has "become the face and embodiment."  (Docket No. 118 at p. 6.)

Turning to the nature of the publicity, Keleher relies on the characterizations of her tenure as Secretary of Education and the statements following her criminal indictments.  (Docket No. 73 at pp. 15–20.)  She notes that the government acknowledges that the media coverage has been extensive and adverse to Keleher.  (Docket No. 118 at p. 1); see also Docket No. 104 at p. 4 (government's acknowledgment).

Keleher does not believe that the delay between that media attention and her trial will materially improve her odds of securing an impartial jury.  This is because she expects negative media attention to continue and because she believes too much damage has already been done.  _Id._ at 10–11, 18–21.  This situation, Keleher asserts, makes her case similar to the circumstances in _Casellas-Toro_, 807 F.3d at 387, where a guilty verdict in an intertwined, just-concluded case contributed to a

presumption of prejudice. (Docket No. 118 at p. 7.) Keleher also contends that the situation negates the possibility that *voir dire* will be able to identify impartial jurors. Id. at p. 8.

Keleher further seeks to distinguish the circumstances here from those related to the Boston Marathon bombing in United States v. Tsarnaev, No. 16-6001, 2020 WL 4381578, at *17–19 (July 31, 2020). Unlike that case, she says, with which most of the country was familiar, Keleher asserts that there are venues in which the allegations against her are not well known and the population is not prejudiced by the Puerto Rico government's history of corruption. (Docket No. 118 at pp. 10–12.) She also alleges that Boston has a larger jury-eligible population which makes finding an impartial jury easier there. Id.

If the Court does not transfer the case to another venue, Keleher asks the Court to "set a trial date as soon as the pandemic permits." (Docket No. 118 at p. 13.) She recognizes that a trial date well into the future which may alleviate some of the prejudice against her but contends that a postponement would infringe her right to a speedy trial. Id. at p. 9.

**III. Legal Standard**

    **A.   Introduction**

        The Constitution generally directs criminal trials to, and impanels a jury from, the place where a crime occurred.

Criminal trials "shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2. The jury should be "of the State and district wherein the crime shall have been committed." Id. amend VI.

The Constitution also guarantees the right to an impartial jury in all criminal prosecutions. Id. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961).

Sometimes, prejudicial circumstances create a presumption[3] that the constitutional guarantee to an impartial jury will be denied a defendant if he is tried where a crime occurred. Where "extraordinary local prejudice will prevent a fair trial" or "there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial," courts presume that prejudice requires a district court to grant a defendant's request for transfer of a criminal trial to another district. Skilling, 561 U.S. at 378; United States v. Quiles-Olivo, 684 F.3d 177, 182 (1st Cir. 2012).

---

[3] A jury may also be actually prejudiced against a defendant. See, e.g., Skilling, 561 U.S. at 377; United States v. Misla-Aldarondo, 478 F.3d 52, 58 (1st Cir. 2007). Actual prejudice is not at issue here; no jury has been impaneled and jury selection has not begun.

Rule 21 of the Federal Rules of Criminal Procedure provides for the transfer of a criminal proceeding to another district in the event of prejudice against the defendant. Fed. R. Crim. P. 21(a). Transfer is mandatory "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Id.; United States v. Walker, 665 F.3d 212, 223 (1st Cir. 2011) (describing Rule 21(a) as "the mandatory transfer provision"). The defendant bears the burden of making the necessary showing. See 2 Charles Alan Wright et al., Federal Practice & Procedure § 343 (4th ed. 2020).

The courts have not decided whether there is a difference between the constitutional and rule-based requirements for transfer in the event of prejudice. The First Circuit Court of Appeals has noted the possibility of different analyses but assumed that the analysis is the same where the parties did not distinguish between the two. Casellas-Toro, 807 F.3d at 385 n.2. The parties here also make no distinction, and the Court assumes the analysis is the same.

The courts have also not decided whether, if a presumption of prejudice arises, the government can rebut the presumption. The United States Supreme Court did not reach the question in Skilling. 561 U.S. at 385 n.18. The First Circuit

Court of Appeals has assumed without deciding that the presumption is rebuttable.  See Casellas-Toro, 807 F.3d at 389.

### B.  Various Ways in Which a Presumption of Prejudice May Arise

Pre-trial publicity is a predominate subject of the analysis on whether a court should presume prejudice to a defendant's fair trial rights.  "A presumption of prejudice is generally 'reserved for those extreme cases where publicity is both extensive and sensational in nature.'"  Casellas-Toro, 807 F.3d at 386 (quoting Quiles-Olivo, 684 F.3d at 182).  The mandatory transfer provision in Rule 21(a) "has been applied almost exclusively in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point."  Walker, 665 F.3d at 223.

The standard for transferring a case based on publicity-induced prejudice is strict.  The Supreme Court has found transfer necessary where the trial atmosphere is "utterly corrupted by press coverage," but "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance."  Skilling, 561 U.S. at 380-81 (emphasis in original) (internal quotation marks omitted).  "Extensive knowledge in the community of either the crimes or the defendants is not sufficient, by itself, to render a trial constitutionally unfair."  United

States v. Drougas, 748 F.2d 8, 29 (1st Cir. 1984).  Also, "[i]f
the media coverage is factual as opposed to inflammatory or
sensational, this undermines any claim for a presumption of
prejudice."  United States v. Angiulo, 897 F.2d 1169, 1181 (1st
Cir. 1990).

       Another factor considered in the presumption analysis is
"a more indirect measure that looks at the length to which the
trial court must go in order to select jurors who appear to be
impartial."  Id. (internal quotation marks omitted).  Courts
usually consider the actual jury selection experience when
evaluating this factor.  See id.

       A host of other considerations are sometimes relevant to
the presumption analysis.  These include a widespread community
impact or bias either from an alleged crime or from something
besides the alleged crime.  See United States v. Campa, 459 F.3d
1121, 1175 (11th Cir. 2006) (en banc) (Birch, J., dissenting).

       Ultimately, all of the factors must be weighed to
determine whether "extraordinary local prejudice will prevent a
fair trial."  Skilling, 561 U.S. at 378; see Murphy v. Florida,
421 U.S. 794, 799 (1975) (evaluating whether "any indications in
the totality of circumstances" demonstrate "that petitioner's
trial was not fundamentally fair").

### C.    United States Supreme Court Precedent

The United States Supreme Court has elucidated how the constitutional analysis is affected by pre-trial publicity and matters of local interest.  Two of the high court's contrasting cases provide a useful framework.

The "foundation precedent," according to the Skilling Court, 561 U.S. at 379, is Rideau v. Louisiana, 373 U.S. 723 (1963).  The defendant in Rideau was interrogated on film while imprisoned and surrounded by law enforcement officers.  Id. at 724–25.  He confessed to a robbery, kidnapping, and murder.  Id. A local television station broadcast the confession on three occasions to audiences ranging from 20,000 to 53,000 individuals. Id.  The parish where the defendant was tried had a population of 150,000 people.  Id.

The Rideau Court held the defendant's due process rights were violated at his trial.  Id. at 726.  "[T]o the tens of thousands of people who saw and heard it," the Rideau Court explained, the interrogation "in a very real sense was Rideau's trial—at which he pleaded guilty."  Id. Following that exhibition, the actual trial amounted to just a "hollow formality" and a "kangaroo court."  Id.

More recently, in Skilling, 561 U.S. at 381–85, the Supreme Court considered whether an executive at Enron Corporation

received a fair trial in Houston, Texas, where Enron was
headquartered. Many people lost their jobs and numerous
organizations lost funding when Enron collapsed. Id. at 427-28
(Sotomayor, J., concurring in part and dissenting in part). Media
attention was rampant. Id. at 382-85 (majority opinion); id. at
427-28 (Sotomayor, J., concurring in part and dissenting in part).
The Skilling Court held the Constitution did not require a
transfer. Id. at 385 (majority opinion).

       The Skilling Court highlighted four factors: the size
and characteristics of the community, the content of publicity,
the length of time between reporting and the trial, and whether
the jury's verdict indicates bias. Id. at 382-84. Unlike the
small parish in Rideau, the Skilling Court noted, Houston was the
United States' fourth-largest city, with a jury-eligible
population of four-and-a-half million individuals. Id. at 382.
Additionally, "although news stories about [the defendant] were
not kind, they contained no confession or other blatantly
prejudicial information of the type readers or viewers could not
reasonably be expected to shut from sight." Id. Third, the
Skilling Court noted that four years elapsed between Enron's
bankruptcy and the defendant's trial, and while related news
stories were published throughout the period, "the decibel level
of media attention diminished somewhat in the years following

Enron's collapse." Id. at 383. Also, "and of prime significance,"
the Skilling Court noted that the jury acquitted the defendant on
nine counts. Id. The Skilling Court further explained that the
"sheer number of victims" did not trigger a presumption of
prejudice, and that "[a]lthough the widespread community impact
necessitated careful identification and inspection of prospective
jurors' connections to Enron, the extensive screening
questionnaire and followup *voir dire* were well suited to that
task." Id. at 384.

### D. First Circuit Court of Appeals Precedent on Prejudice Arising from Publicity

Some cases on pre-trial publicity tend to be fairly easy
to resolve. For instance, in Quiles-Olivo, 684 F.3d at 182, there
was "limited-to-no media coverage on the case" and "the record
[wa]s devoid of any suggestion—let alone evidence—that if any such
media coverage took place, it was inflammatory, sensational, or
otherwise capable of prejudicially enshrouding [the defendant's]
chances of a fair trial." In Angiulo, 897 F.2d at 1181, news
coverage was "extensive" but "largely . . . factual in nature,
summarizing the charges against the defendants and the alleged
conduct that underlay the indictment." Even references to one
defendant as a "mafia boss" and like characterizations "f[e]ll
significantly short of the type of emotionally charged,

inflammatory, sensationalistic coverage needed to support a presumption of prejudice." Id. Similarly, in United States v. Maldonado-Medina, 761 F.2d 12, 18-19 (1st Cir. 1985), no presumption of prejudice arose from widespread media coverage constituted of "straightforward, unemotional, factual accounts of events and of the progress of official and unofficial investigation."

Even a high-profile case like United States v. Misla-Aldarondo did not trouble the courts. 478 F.3d 52, 59 (1st Cir. 2007). The defendant had been Speaker of the Puerto Rico House of Representatives. Id. at 56. He was tried for extortion, money laundering, and witness tampering arising "from a scheme by a group bidding to purchase a state hospital being privatized." Id. The defendant was simultaneously investigated on charges of sexual assault on a minor. Id. at 59. "The publicity surrounding th[e] case was undoubtedly extensive." Id.

The Misla-Aldarondo court held that no presumption of prejudice arose. Although the defendant introduced over 180 articles attempting to show a saturation of inflammatory publicity, the Misla-Aldarondo court held that the articles did not show an abuse of discretion in denying a transfer, especially given the "extensive and individualized *voir dire*" at which only 15% of potential jurors were excused for potential bias. Id.

Other cases decided by the First Circuit Court of Appeals lean toward or require transfer.  One of these is <u>United States v. Moreno-Morales</u>, 815 F.2d 725, 734-39 (1st Cir. 1987).

The facts in <u>Moreno-Morales</u> were dramatic.  In 1978, police killed two members of the Puerto Rico independence movement planning to sabotage a television tower.  <u>Id.</u> at 729.  Details emerged suggesting that the individuals were murdered after they had surrendered to police.  <u>Id.</u>

Public attention to the killings was "immediate and intensive."  <u>Id.</u>  The Senate of Puerto Rico held hearings for the better part of 1983.  <u>Id.</u>  A central issue of the 1984 gubernatorial campaign became whether the government participated in a coverup.  <u>Id.</u> at 730.  A federal grand jury investigated for roughly four years, culminating in charges of perjury and conspiracy to commit perjury and other crimes.  <u>Id.</u> at 729-30.

The defendants' federal trial was continued in August of 1984 because of the extensive and prejudicial publicity surrounding the case.  <u>Id.</u> at 730.  Two months after the gubernatorial election, the district judge denied another continuance.  <u>Id.</u>  The defendants never requested a change of venue.  <u>Id.</u> at 734.

The <u>Moreno-Morales</u> majority held the defendants' constitutional right to a fair trial was not violated.  <u>Id.</u> at

734-39.   The Moreno-Morales majority recognized the widespread
media coverage and public following of the case, adding that
"Puerto Rico is highly susceptible to the impact of local media"
because it is "a compact, insular community."  Id. at 734.   The
Moreno-Morales majority noted, however, that "the charged conduct,
violent and brutal though it was, would not cause [the defendants]
to be seen in black and white terms by all members of the community
equally."  Id. at 736.   Additionally, the Moreno-Morales majority
explained that "the overwhelming lynch-mob atmosphere described in
Rideau was not present" in the case, pointing to the distinction
between a defendant's confession televised weeks before trial and
incriminating statements from immunized witnesses publicized two
years before trial.   Id.  Before concluding, the Moreno-Morales
majority observed, "If an accused in a situation such as the
present seeks a change of venue, judicial fairness may require
that it be granted.  As in Rideau, should the request be denied,
this could be a denial of due process of law."  Id. at 739.

        In Casellas-Toro, 807 F.3d at 382-83, the defendant told
federal law enforcement officers in June 2012 that he was the
victim of carjacking and two of his guns were stolen.  A month
later his wife was murdered.  Id. at 383.  The defendant's father
was a United States District Court judge.  Id. at 384.

The Puerto Rican media began extensively reporting on the case, including the defendant's interview with law enforcement, the condition of the victim's body, and allegedly false rumors about the defendant. Id. at 383-84. After a trial in the courts of the Commonwealth of Puerto Rico, a jury convicted the defendant of murdering his wife. Id. at 383. When the defendant was found guilty, "[c]itizens celebrated," "an entire stadium of people attending a baseball game erupted into cheers," and "[t]elevision coverage of the . . . verdict received the top Nielson rating for that month." Id. "The Supreme Court of Puerto Rico permitted the media to broadcast [the defendant's] sentencing live on television, internet, and radio." Id. at 383-84.

Eight days after he was convicted, the defendant was indicted by a federal grand jury for making false statements to a federal officer. Id. at 383. His sentencing in the Puerto Rico court occurred one week later. Id. And the defendant's initial appearance in federal court came the following day. Id.

The defendant moved to transfer to another district. Id. at 383-84. The government did not oppose transfer. Id. at 384. The district court reserved ruling on the motion until voir dire. Id.

Voir dire revealed that almost all the potential jurors had heard of the defendant. Id. In the end, the court overruled

the motion to change venue.  Id.  The federal jury convicted the
defendant of all three false statement counts, and the district
court acquitted him on two counts.  Id. at 385.

     The Casellas-Toro court held that prejudice should have
been presumed in the case.  Id. at 386-88.  The court relied on
the same factors examined in Skilling.  Id.  Those factors revealed
the situation before the Casellas court to be an "extreme case."
Id. at 388.

     With respect to the size and characteristics of the
community, the court observed the district court's note that "more
than 3 million people live in Puerto Rico, mitigating the potential
for prejudice among the jurors ultimately selected."  Id. at 386
(internal quotation marks omitted).  The Casellas court also
pointed to the district court's acknowledgment, consistent with
Moreno-Morales, 815 F.2d at 734, that Puerto Rico is "a compact,
insular community" that is "highly susceptible to the impact of
local media."  Id. at 386 (internal quotation marks omitted).  The
district court further agreed with defense counsel that Puerto
Rico is a small island.  Id. at 387.

     On the nature of the reporting, the Casellas court
recognized that the government stated that the media coverage was
"massive" and "sensational."  Id.  The Casellas court found that
"the media here publicized 'blatantly prejudicial information of

Criminal No. 20-019 [1] (FAB)                                         23

the type readers or viewers could not reasonably be expected to shut from sight.'" Id. at 387 (quoting Skilling, 561 U.S. at 382).

"Most importantly," the Casellas court highlighted, "the media extensively and sensationally covered [the defendant's] Commonwealth trial, conviction, and sentencing in a just-concluded case intertwined with this one." Id. The Casellas court said that, although "[a] jury may be able to disbelieve unfounded opinions of the media or other people . . . . it may have difficulty disbelieving or forgetting the opinion of another jury, twelve fellow citizens, that a defendant is guilty in an intertwined, just-concluded case." Id.

Finally, the Casellas-Toro court noted that the jury in the proceedings below convicted the defendant of all three counts. Id. at 388.

**E.   Precedent on Prejudice Arising from the Impact of an Alleged Crime or from Something Else**

Some cases involve a transfer request based on a widespread community impact or bias either from the alleged crime or from something else. See Campa, 459 F.3d at 1175. Terrorism cases are a prime example of the former category. See, e.g., Tsarnaev, 2020 WL 4381578 (Boston Marathon bombing); United States v. McVeigh, 918 F. Supp. 1467, 1475 (W.D. Okla. 1996) (Oklahoma City bombing).

Cases in the latter category (i.e., involving assertions of prejudice arising from something besides the alleged crime) have involved arguments concerning the impact of a hurricane, a financial crisis, racism, and a locale's notoriety for drug crimes. See United States v. Brandon, 17 F.3d 409, 441–42 (1st Cir. 1994); United States v. Warren, 989 F. Supp. 2d 494, 503 (E.D. La. 2013); United States v. Salim, 189 F. Supp. 2d 93, 96–97 (S.D.N.Y. 2002); United States v. Washington, 813 F. Supp. 269, 271 (D. Vt. 1993); United States v. Wheaton, 463 F. Supp. 1073, 1078 (S.D.N.Y. 1978). Another case that bears mention is Misla-Aldarondo, 478 F.3d at 59, in which, as noted above, the former Speaker of the Puerto Rico House of Representatives was investigated for sexual assault on a minor unrelated to the federal charges at issue in the case. The courts in this group of cases generally decline to presume prejudice and decide to employ *voir dire* to examine the extent of bias and root it out.

In Tribble, 2020 WL 3485824, at *11, this Court recently denied a request for transfer premised on prejudice stemming from something besides the alleged crime.  The defendant sought a transfer based on the impact of Hurricane María.  Id.  The Court expressed a belief that jurors would be able to separate their feelings about the natural disaster and its effects from the criminal allegations involved in the case, and explained that *voir*

*dire* would be an effective way of identifying those who could not. Id.

## IV.  Discussion

Keleher has failed to show that "extraordinary local prejudice will prevent a fair trial" or that "there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial."  Skilling, 561 U.S. at 378; Quiles-Olivo, 684 F.3d at 182.  Therefore, no presumption of prejudice arises.

### A.  Size and Characteristics of the Community

#### 1.  Relevant Population

The parties dispute the relevant population for the Court's analysis.  Keleher contends that language requirements for jury service bear on the Court's resolution of the defendants' motion to transfer venue, (Docket No. 73 at pp. 13–14; Docket No. 118 at pp. 2–3,) while the government suggests that the relevant group is all adult United States citizens residing in Puerto Rico, (Docket No. 104 at pp. 6–7.)

Frankly, the courts have been less than clear on this issue.  Some opinions discuss the total population of a given area, see, e.g., Rideau, 373 U.S. at 724; Casellas-Toro, 807 F.3d at 386, while others concentrate on the jury-eligible population, see, e.g., Skilling, 561 U.S. at 382.

This Court need not decide the relevant population. Even assuming Keleher is correct that the Court should consider the jury-eligible population, the size of the community does not contribute to a presumption of prejudice, alone or in combination with Keleher's other arguments.

Keleher does not argue that the jury-eligible population is differently or extraordinarily prejudiced against her. Rather, her argument is that it will be more difficult to find an impartial jury among 270,000 persons (her estimate of the jury-eligible population in Puerto Rico) than it would be if the population was larger. (Docket No. 73 at pp. 13–14; Docket No. 118 at pp. 2–3.) Keleher's survey of English-speaking Puerto Rico residents, however, suggests the difficulties will be easily overcome: with respect to the allegations in Criminal No. 19-431, 35% of survey respondents thought Keleher was innocent, did not know whether she was guilty, or were unfamiliar with the case. (Criminal No. 19-431, Docket No. 172, Ex. 1 at p. 17.)[4]  In any event, a review of the other factors at play does not suggest that

---

[4] Perhaps there is a difference in the public's view of the charges in this case compared to the charges in Criminal No. 19-431. Or maybe the public's view has shifted.  Keleher, however, does not think so; in this case, she extensively relies on her survey in Criminal No. 19-431 without making any such distinctions or arguments.  And Keleher does not present any material showing a difference in, or a shift of, public perception. Consequently, the Court also considers the survey as applicable to this case.

prejudice should be presumed among Puerto Ricans generally or the English-speaking population specifically.

### 2.   Susceptibility to Local Media

Keleher also contends, relying on caselaw, that Puerto Rico is "a compact, insular community" that is "highly susceptible to the impact of local media."   (Docket No. 73 at pp. 6, 13, 15, 20 (internal quotation marks omitted).)   The statement originated in a judicial opinion from 1987.   Moreno-Morales, 815 F.2d at 734.   In 2015, the First Circuit Court of Appeals observed that a judge sitting by designation in this Court acknowledged the statement.   Casellas-Toro, 807 F.3d at 386. Recently, the First Circuit Court of Appeals contrasted the Casellas-Toro court's observation with its view of Boston, Massachusetts.   Tsarnaev, 2020 WL 4381578, at *19.

The statement describing the Puerto Rico community and its susceptibility to local media may or may not be true today. The advent of the internet and social media (and other developments) may have changed the circumstances that existed in 1987 and even the circumstances existing at the time of the opinion discussed in Casellas-Toro.   Like the residents of Boston, it is possible that Puerto Ricans now "obtain their news from a vast array of sources."   In re Tsarnaev, 780 F.3d 14, 21 (1st Cir. 2015).

Keleher does not offer support for the fact-laden notion of susceptibility to local media besides citations to judicial authority.  Her survey in Criminal No. 19-431 appears to whittle away at the notion—it found that fifty-five percent of those who heard about the case had seen at least one internet report about the case, while fifteen percent had not heard of the case and thirty-five percent had not concluded that she is guilty. (Criminal No. 19-431, Docket No. 172, Ex. 1 at pp. 13, 17.)

It is not immediately apparent to the Court that Puerto Ricans are especially susceptible to local media.  And it is not a fact of which the Court may take judicial notice pursuant to Federal Rule of Evidence 201(b).

Had Keleher supported the notion that Puerto Rico is highly susceptible to the impact of local media, she would still need to show that the press coverage is of a type giving rise to a presumption of prejudice.  The Court turns to that issue shortly.

### 3. Prejudice Arising from Keleher's Tenure as Secretary of Education, from Alleged Corruption in Puerto Rico, and from the Charges Against Keleher in Criminal No. 19-431

The Court believes that a presumption of prejudice is not warranted by the public sentiment concerning Keleher's time as Secretary of Education, the history of corruption in Puerto Rico, and the charges against Keleher in Criminal No. 19-431.  Like

other courts asked to transfer a case for reasons unrelated to the
alleged crime or its associated publicity, the Court believes that
jurors will be able to separate any such feelings from the criminal
allegations involved in this case and that *voir dire* will be an
effective tool for identifying and rooting out prejudice or bias.
See, e.g., Misla-Aldarondo, 478 F.3d at 59; Brandon, 17 F.3d at
441–42; Warren, 989 F. Supp. 2d at 503; Salim, 189 F. Supp. 2d at
96–97; Washington, 813 F. Supp. at 271; Wheaton, 463 F. Supp. at
1078; see also Patton v. Yount, 467 U.S. 1025, 1038 and n.13
(1984).   Moreover, the sizeable proportion of respondents in
Keleher's survey who had not heard of the charges against her in
Criminal No. 19-431 or had not concluded she is guilty of those
charges lends credence to the notion that there is a reasonable
likelihood that the Court will be able to identify twelve jurors
who will not prejudge the case against the defendants.   See
Criminal No. 19-431, Docket No. 172, Ex. 1 at pp. 13, 17.

          To be sure, the charges against Keleher in Criminal
No. 19-431 are notable in the transfer analysis.  The First Circuit
Court of Appeals has found that a highly publicized guilty verdict
in a recently concluded and intertwined case contributed to a
presumption of prejudice.  Casellas-Toro, 807 F.3d at 387.  Here,
however, Keleher has not been found guilty in Criminal No. 19-431
and the charges in that case are not intertwined with the charges

in this case.  Just as a co-defendant's widely publicized decision
to plead guilty can be managed with appropriate steps, Skilling,
561 U.S. at 384–85, and *voir dire* could address an investigation
into sexual assault on a minor concerning the former Speaker of
the Puerto Rico House of Representatives charged with unrelated
crimes, Misla-Aldarondo, 478 F.3d at 59, there are measures
available to the Court here to manage prejudice and identify
impartial jurors.  It is therefore improper at this stage of the
proceedings to presume prejudice based on the charges in Criminal
No. 19-431.

####          4.   Synthesis

          The size and characteristics of the community are
largely neutral with respect to whether the case against Keleher
should be transferred.  In some ways these factors weigh against
transfer, including because of the substantial proportion of
English-speaking Puerto Rico residents in Keleher's survey who did
not think she is guilty of the charges in Criminal No. 19-431 or
had not heard of that case.  In other ways it is too early to
presume prejudice or unnecessary because of the efficacy of *voir
dire*.  Even assuming that the Court should only consider the jury-
eligible population and that this population is highly susceptible
to local media, Keleher must show circumstances that prejudice her
to such an extent that a fair trial is not possible.

**B.  Press coverage**

Keleher has failed to show that inflammatory publicity has prejudiced the community.  This factor weighs against transfer.

The publicity cited by Keleher, as in <u>Skilling</u>, is "not kind" but "contain[s] no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  561 U.S. at 382.  There is no "smoking-gun" in the reporting.  <u>Id.</u> at 383.  It is largely factual.  The characterizations in the media of Keleher and of the various charges against her—reprehensible, disgraceful, trust-eroding and selfish, "Hurricane Keleher," the largest earthquake to pass through the Department of Education, a repeat of a former Secretary of Education—are not more prejudicial than references to a "mafia boss" and like descriptions, all of which "fall significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." <u>Angiulo</u>, 897 F.2d at 1181; <u>see</u> <u>Tribble</u>, 2020 WL 3485824, at *12.  The publicity does not require a venue transfer.  <u>See</u> <u>Quiles-Olivo</u>, 684 F.3d at 182 (discussing media coverage); <u>Angiulo</u>, 897 F.2d at 1181 (same); <u>Maldonado-Medina</u>, 761 F.2d at 19 (same).

### C.   Delay Between Media Attention and Trial

The frequency of media reports identified by Keleher already seems to have ebbed.  She cites some recent attention, but most of the reports on which she relies are from the time she was indicted in this case or earlier.  This suggests that, like in _Skilling_, news stories are still being published but "the decibel level of media attention [has] diminished somewhat."  561 U.S. at 383.

Keleher may be correct that media attention will continue.[5]  Even in those circumstances, prejudice and partiality are not inevitable.  _Id._ at 380-81.  Criminal cases arouse the interest of the public, _Irvin_, 366 U.S. at 722-23, so it is not surprising when people are aware of a high-profile case, _Tsarnaev_, 780 F.3d at 15.

This factor, then, is currently neutral or leaning against transfer.  Even if it may lean toward granting the requested transfer at some point in the future, it is insufficient to require a transfer unless the nature of the reporting or some other circumstances change.

---

[5] For instance, the recent superseding indictment in Criminal No. 19-431 received some media attention, which can be characterized as low decibel. _See, e.g._, El Nuevo Día, _New Defendant in the Case Against Keleher_, https://www.elnuevodia.com/english/news/story/new-defendant-in-the-case-against-keleher/ (Aug. 12, 2020).

## V.    Conclusion

For the reasons discussed above, Keleher's motion to transfer venue, (Docket No. 73,) is **DENIED**, and her request for a trial as soon as possible, (Docket No. 118 at p. 13,) is **NOTED**.

**IT IS SO ORDERED**.

San Juan, Puerto Rico, August 17, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE