**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff**,

             **v.**

JULIA BEATRICE KELEHER [1];
ARIEL GUTIÉRREZ-RODRÍGUEZ [2],

    **Defendant.**

**Criminal No.** 20-019 (FAB)

**OPINION AND ORDER**

Defendants Julia Beatrice Keleher ("Keleher") and Ariel Gutiérrez-Rodríguez ("Gutiérrez," and together with Keleher, the "defendants") each filed several motions to dismiss the indictment or certain counts in the indictment. (Docket Nos. 57–59, 67–69, 85.) One of Keleher's motions alternatively seeks dismissal of an allegation in one count, striking of the allegation, or a bill of particulars. (Docket No. 67.) As discussed below, the defendants' motions are all **DENIED**.

**I.   Background**

The following factual recitation is taken from the indictment. (Docket No. 3.) "When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true . . . ." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015).

Keleher was the Secretary of the Puerto Rico Department of Education ("DOE") from approximately January 2017 to April 2019. Id. at p. 1.  Gutiérrez was a consultant who provided services to Company A and Company B.  Id. at p. 4.

Company A bought, sold, leased, and managed real estate.  Id. at p. 3.  Company B was a consulting business.  Id.  The same individual was president of both companies.  Id.  The two companies also shared office space.  Id.

Company C owned Ciudadela, a luxury housing complex in Santurce, Puerto Rico.  Id.

Individual A was the chief executive officer of Company C. Id. at p. 4.  Individual A also served as the president of Company D.  Id.

Company D was a non-profit organization set up to promote education-related initiatives in Puerto Rico.  Id. at p. 3. Company D disbursed money to the entity which paid Keleher's salary.  Id.  Company D received more than $750,000 from Company E, another non-profit entity.  Id. at p. 4.

On June 7, 2018, Keleher signed a lease for a two-bedroom apartment in Ciudadela.  Id.  The agreement valued the monthly rental price at $1,500.00, but allowed her to occupy the apartment until no later than August 15, 2018, for the nominal amount of $1.00.  Id.  Pursuant to the agreement, Keleher was to purchase

the apartment for $297,500.00, and receive an incentive bonus of $12,000.00 in connection with the purchase.  Id.  Prior to signing the agreement, Keleher sent an e-mail to an employee of Company A confirming that she would receive the incentive bonus.  Id. at p. 8.

The lease agreement expired on August 15, 2018.  Id. at p. 4. Keleher remained living in the apartment until purchasing it on or about December 4, 2018.  Id.  So Keleher occupied the apartment from June 7, 2018, to December 4, 2018, for $1.00.  Id.

Ciudadela is adjacent to Escuela Especializada Bilingüe Padre Rufo ("Padre Rufo School").  Id. at p. 3.  The Padre Rufo School operated under the auspices of the DOE.  Id.

Beginning in May 2018, Gutiérrez communicated with one or more DOE employees working at the Padre Rufo School to obtain assent for Company C to acquire 1,034 square feet of the Padre Rufo School.  Id. at p. 7.  Gutiérrez sent a letter to a DOE employee at the Padre Rufo School seeking authorization for Company C to acquire the land.  Id.  Another letter he sent to a DOE employee at the school was a draft of a letter addressed to Keleher in which the DOE employee assented to Company C's acquisition of the land.  Id.  The DOE employee signed the letter. Id.  And, on June 22, 2018, Gutiérrez e-mailed Keleher about Company C's request to acquire the Padre Rufo School land.  Id. at

p. 8.  Keleher forwarded the e-mail to herself the following day.
Id.

Then, on July 17, Gutiérrez sent to Keleher via e-mail a draft
of a letter to Individual A.  Id. at p. 7.  The letter purported
to authorize Company C to acquire 1,034 square feet of the Padre
Rufo School.  Id. at pp. 6-7.  Keleher had the letter placed on
DOE letterhead and signed it.  Id. at p. 7.  Also on July 17,
Keleher e-mailed a DOE employee attaching documents relating to
Company C's acquisition of the Padre Rufo School land.  Id. at
p. 8.

Gutiérrez and Keleher exchanged at least one other e-mail.
On August 20, Gutiérrez offered assistance to Keleher to obtain a
bank loan.  Id.

Another e-mail, dated August 21, was sent from Individual A
to Keleher and to a representative of Company E.  Id.  In this e-
mail, Individual A confirmed that money should be disbursed to
Company D.  Id.  This e-mail was not charged as an instance of
wire fraud.  See id. at pp. 9-10.

In January 2020, Keleher and Gutiérrez were indicted in this
case.  Id. passim.  The charges include conspiracy to commit honest
services fraud (count one), wire fraud (counts two through seven),
and federal program bribery (counts eight and nine).  Id.

## II.  Legal Standard for Motions to Dismiss

The Constitution guarantees, with exceptions not relevant here, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury", and that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amends. V, VI. The Federal Rules of Criminal Procedure effect these guarantees in part through the requirement that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

A defendant in a criminal case may move to dismiss an indictment before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Id. R. 12(b)(3). The defendant may assert that there is a defect in the indictment, including "lack of specificity" and "failure to state an offense." Id. R. 12(b)(3)(B).

The test for a sufficient indictment is defined by an indictment's functions. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,

and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); see United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007).

Those principles are clear in the first circuit. The indictment "need only outline the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (internal quotation marks omitted); see United States v. Sepúlveda, 15 F.3d 1161, 1192 (1st Cir. 1993). "Unlike a civil complaint that need allege facts that plausibly narrate a claim for relief, a criminal indictment need only apprise the defendant of the charged offense, so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." United States v. Rodríguez-Rivera, 918 F.3d 32, 34 (1st Cir. 2019) (citations and internal quotation marks omitted).

There is a narrow exception to that test. "[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." United States v. Musso, 914 F.3d 26, 29-30 (1st Cir. 2019) (internal quotation marks omitted); see United States

v. Del Valle-Fuentes, 143 F. Supp. 3d 24, 26-28 (D.P.R. 2015)
(Besosa, J.) (collecting cases and explaining the exception).

"An indictment must set forth each element of the crime that
it charges." Almendárez-Torres v. United States, 523 U.S. 224,
228 (1998). And, "[w]here guilt depends so crucially upon such a
specific identification of fact, . . . an indictment must do more
than simply repeat the language of the criminal statute." Russell
v. United States, 369 U.S. 749, 764 (1962).

A Rule 12(b) motion, however, does not "provide[] an occasion
to force the government to defend the sufficiency of its evidence
to be marshalled in support of proving the charged offense."
Rodríguez-Rivera, 918 F.3d at 35. "[T]he government need not
recite all of its evidence in the indictment." Stepanets, 879
F.3d at 372 (internal quotation marks omitted). "At the indictment
stage, the government need not 'show,' but merely must allege, the
required elements." United States v. Stewart, 744 F.3d 17, 21
(1st Cir. 2014). "[W]hen a defendant seeks dismissal of the
indictment, the question is not whether the government has
presented enough evidence to support the charge, but solely whether
the allegations in the indictment are sufficient to apprise the
defendant of the charged offense." Stepanets, 879 F.3d at 372
(internal quotation marks omitted). And, of course, "a court must

deny a motion to dismiss if the motion relies on disputed facts."

Id.

## III. Discussion

A.   **Keleher's Motion to Dismiss the Indictment and Gutiérrez's Motions for Dismissal of Counts 1, 3, 5, 7, and 9**

Keleher seeks dismissal of the entire indictment on the grounds that it does not allege an official act. (Docket No. 69.) Gutiérrez makes a similar argument in seeking dismissal of the indictment's honest services fraud conspiracy and federal program bribery counts, as well as some of the wire fraud counts. (Docket No. 57; Docket No. 85 at pp. 11-18.)

Keleher contends that all of the charges in the indictment require an official act. (Docket No. 69 at pp. 2, 10-12.) She states that a number of recent cases support her argument. Id. at pp. 10-12 (citing, among other cases, McDonnell v. United States, 136 S. Ct. 2355 (2016); Woodward v. United States, 905 F.3d 40 (1st Cir. 2018); United States v. Bravo-Fernández, 722 F.3d 1 (1st Cir. 2013); and United States v. Carrasco-Castillo, 442 F. Supp. 3d 479 (D.P.R. 2020) (Besosa, J.)). Keleher indicates that, in McDonnell, the Supreme Court explained that there are two ingredients to an official act:

> First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so.

Id. at p. 12 (quoting 136 S. Ct. at 2368). She also points out that the McDonnell Court held that the definition of an official act does not include either "a typical meeting, call, or event arranged by a public official," or "[s]imply expressing support . . . at a meeting, event, or call." Id. at p. 13 (quoting 136 S. Ct. at 2369, 2371).

Keleher asserts that she had no official role in acting on Company C's request to acquire the Padre Rufo School land. Id. at p. 2. She states that DOE does not own the Padre Rufo School, and has no authority under its enabling statute to cede or sell public land. Id. at p. 5. She also indicates that the Commonwealth of Puerto Rico owns the property, and that the Puerto Rico Department of Transportation and Public Works ("DTOP" for its Spanish acronym) is designated as the custodian of, with authority to sell, all the property owned by the Commonwealth. Id. at pp. 7-8.

Therefore, Keleher argues, the letter on which she affixed her signature "was, at best, an expression of support, or lack of objection to, Company C's acquisition of the property. It

was not be [*sic*] a decision by [Keleher] on a matter before her in her official capacity as Secretary of [DOE]." Id. at p. 2. Keleher therefore concludes that the indictment does not allege she took an official action, or that she agreed to take an official action. Id. at pp. 15–16.

Most of Gutiérrez's contentions track Keleher's argument. See Docket No. 57; Docket No. 85 at pp. 11–18. Gutiérrez adds that he does not believe the indictment alleges the first element of the McDonnell test—identification of a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official. (Docket No. 57 at pp. 15–17; Docket No. 85 at p. 16.) According to Gutiérrez, the question of whether to cede the Padre Rufo School land to Company C was not pending before the DOE and the DOE could not exercise formal governmental power to adjudicate the question. (Docket No. 57 at pp. 15–17; Docket No. 85 at p. 16.)

The government responds with a four-pronged approach. (Docket No. 148.) First, the government argues that a motion to dismiss the indictment is not the proper vehicle to advance the defendants' arguments. Id. at pp. 3–6. The government points to the limited role of motions to dismiss criminal indictments and characterizes the defendants' argument as "akin to a motion under Rule 29 of the Federal Rules of Criminal Procedure." Id. at p. 4.

Second, the government argues that the indictment alleges a question or matter. Id. at pp. 8-9. The government states that whether the Padre Rufo School land should be ceded to Company C is a question that could be pending or brought before another public official, and therefore satisfies the McDonnell test and the requirements of 18 U.S.C. § 201(a)(3). Id. Third, the government argues that Keleher agreed to, and did, take an official act. Id. at pp. 9-10. Fourth, the government argues that Keleher did not need authority to cede the Padre Rufo School for the defendants to commit the crimes with which they are charged. Id. at pp. 10-14.

The Court agrees with the government's first argument. The defendants largely focus on whether the government has shown that Keleher committed an official act, or that the defendants agreed to commit an official act,[1] but those questions are not properly raised in a motion to dismiss. Stewart, 744 F.3d at 21. The indictment alleges, among other things, that a purpose of the conspiracy was for Keleher to enrich herself and others to obtain favorable action, and that Gutiérrez facilitated Keleher's receipt of financial benefits in exchange for Keleher's signing, on DOE letterhead, a letter purporting to authorize Company C to acquire 1,034 square feet of the Padre Rufo School. (Docket No. 3 at

---

[1] The government raises the question of whether 18 U.S.C. § 666 requires an official act. (Docket No. 148 at p. 3 n.3.) For purposes of this opinion, the Court assumes it does.

pp. 5-7.)  The indictment's allegations satisfy the government's burden at this stage, because they sufficiently notify the defendants of the crimes with which they are charged and would allow them to raise a double jeopardy issue should that become warranted.  Rodríguez-Rivera, 918 F.3d at 34-35; Stepanets, 879 F.3d at 372; Sepúlveda, 15 F.3d at 1192.

A jury, not this Court, must determine whether Keleher's actions, including the letter "authoriz[ing]" Company C to acquire the Padre Rufo School land, constitute an official act or evidence an agreement to take an official act.  The same goes for whether Gutiérrez intended to influence an official act.  "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged quid pro quo."  McDonnell, 136 S. Ct. at 2371.

There are, however, two lurking issues raised by the defendants.  Gutiérrez argues that the indictment does not allege a question or matter because the ceding of the land was not pending before the DOE and could not be formally adjudicated by the DOE. The defendants also argue that Keleher lacked authority to cede the Padre Rufo School land and therefore no official act could have been taken or agreed to.  The government does not dispute the ability of the Court to reach the arguments and does not dispute the pertinent facts.  See Docket No. 148 at pp. 10-14; Docket

No. 170 at pp. 17-25.  Consequently, these two arguments can be addressed at this time.  Musso, 914 F.3d at 29-30; Del Valle-Fuentes, 143 F. Supp. 3d at 26-28.

Gutiérrez's argument about a question or matter is easily dispensed.  Whether to cede the land is "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  McDonnell, 136 S. Ct. at 2369.  And the defendants themselves state that the ceding of the Padre Rufo School land was pending or could have been brought before another public official, namely, an official at DTOP.  See Docket No. 57 at p. 16; Docket No. 69 at p. 8; Docket No. 85 at p. 85.  The test in McDonnell, 136 S. Ct. at 2368, and 18 U.S.C. § 201(a)(3) require that the question or matter be pending or be able to be brought before "a" public official or "any" public official, not just the official under indictment.  Consequently, Gutiérrez's argument fails.

Additionally, the government provides ample authority[2] holding or supporting that a briber and bribee may be guilty of

---

[2] See, e.g., United States v. Silver, 948 F.3d 538, 551 (2d Cir. 2020); Cordaro v. United States, 933 F.3d 232, 243 (3d Cir. 2019); United States v. Ring, 706 F.3d 460, 470 (D.C. Cir. 2013); United States v. Andrews, 681 F.3d 509, 529-30 (3d Cir. 2012); United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 824-25 (9th Cir. 1985); United States v. Myers, 692 F.2d 823, 850 (2d Cir. 1982); United States v. Anderson, 509 F.2d 312, 332 (D.C. Cir. 1974); United States v. Rosner, 485 F.2d 1213, 1229 (2d Cir. 1973); Wilson v. United States, 230 F.2d 521, 526 (4th Cir. 1956); Kemler v. United States, 133 F.2d 235, 238 (1st Cir. 1942); United States v. Fedorovsky, Crim. No. 16-437, 2017 WL 2210251, at *3 (D. Md. May 18, 2017).

bribery even if the bribee lacked authority to accomplish the
result the briber desired.   The Court finds this authority
persuasive.   As a result, a deficiency in Keleher's actual
authority to cede the Padre Rufo School land does not warrant
dismissal.

### B.   Keleher's Motion to Dismiss Count Eight and Gutiérrez's Motion to Dismiss Count Nine

Keleher moves to dismiss the federal program bribery
count against her for a variety of reasons.   (Docket No. 68.)
Gutiérrez makes many of the same arguments in seeking dismissal of
the federal program bribery count against him.   (Docket No. 85 at
pp. 2-4, 18-26.)  He joins Keleher's motion to dismiss count eight,
stating that "[t]he relevant facts and applicable law are exactly
the same as to Counts 8 and 9." Id. at p. 26.

Keleher and Gutiérrez first argue that count eight does
not allege an agency transaction.   (Docket No. 68 at pp. 1-2, 5;
Docket No. 85 at pp. 2, 18-21.).  The defendants emphasize that 18
U.S.C. section 666 requires the transaction at issue to be a
transaction of the agency that receives $10,000 in federal
benefits.  (Docket No. 68 at p. 5; Docket No. 85 at pp. 18-21.)
They note that the indictment does not identify Company C's
acquisition of the Padre Rufo School land as a transaction of

either the DOE or the DTOP.  (Docket No. 68 at p. 5; Docket No. 85
at pp. 18-21.)

        Second, the defendants contend that section 666 requires
a federal agency to receive more than $10,000 in federal benefits
from a single federal program.  (Docket No. 68 at p. 6; Docket
No. 85 at pp. 25-26.)   According to the defendants, the
indictment's allegation that the DOE receives more than $10,000 in
aggregated federal assistance is insufficient to meet section
666's requirements.  (Docket No. 68 at p. 6; Docket No. 85 at
pp. 25-26.)

        Third, the defendants contend that the indictment fails
by not identifying the federal program or programs through which
the DOE receives federal benefits.  (Docket No. 68 at pp. 6-9;
Docket No. 85 at pp. 22-25.)  They observe that numerous courts
have explained that a conviction pursuant to section 666 requires
proof of federal benefits.  (Docket No. 68 at pp. 6-9 (citing, for
example, United States v. Bravo-Fernández, 913 F.3d 244, 248-50
(1st Cir. 2019)); Docket No. 85 at pp. 22-25 (same).)   Keleher
argues that "the agency's receipt of such federal benefits under
a specified type of federal program is an element of the offense,
and . . . a generalized allegation that an entity received
payments from the Federal Government is not sufficient to satisfy
it."  (Docket No. 68 at pp. 6-7.)  Gutiérrez makes the same point

in bemoaning the notice given by the indictment.  (Docket No. 85 at pp. 22-25.)

       Fourth, Keleher argues that the indictment does not allege that any federal funds were put at risk.  (Docket No. 68 at pp. 9-12.)  According to Keleher, section 666 "is constitutional only because it requires[] that a federal interest is implicated by the possibility that a bribe could affect federal dollars." Id. at p. 10.

       The government opposes the defendants on each point. (Docket No. 131.)  As a preliminary matter, the government asserts that there is no basis to dismiss counts eight and nine because they "both allege the elements of a section 666 violation and apprise the defendants of the nature of the offenses they face." Id. at p. 4.

       The government then contends that the indictment sufficiently alleges an agency transaction.  The government indicates that the indictment specifically alleges that Keleher sought to be influenced in Company C's acquisition of the Padre Rufo School land from the DOE.  Id. at p. 5.  The government also points to caselaw holding that an agent does not need to have actual authority over a transaction to violate section 666.  Id. at pp. 6-7.  Additionally, the government argues that it need not allege or prove at trial which is the entity with final decision-

making authority over the transaction. Id. at p. 7. Finally, the
government asserts that "whether the transaction at issue
qualified as one of the PR DOE is ultimately a factual question
for the jury, not a legal one for the Court to decide in ruling on
a motion to dismiss." Id. at p. 7.

Concerning the $10,000 threshold for federal benefits in
section 666, the government argues against dismissal "[e]ven if
the Court were to assume that the defendants have correctly
interpreted the indictment." Id. at p. 8. The government argues
that benefits of various programs may be aggregated. Id. at pp. 8–
9. According to the government, the defendants' interpretation
would lead to absurd results because an agency that received
benefits of $9,000 from each of several programs would not be
covered by section 666. (Docket No. 170 at pp. 8–10.)

The government further acknowledges that it has an
obligation to prove that an entity received federal benefits and
not just federal funds. (Docket No. 131 at pp. 9–10.) The fact
that the indictment does not prove the receipt of the benefits,
the government continues, is of no moment because the obligation
arises during trial. Id. The government indicates that the cases
cited by the defendants in support of their argument address the
sufficiency of evidence at trial, and the government offers a
handful of cases holding that an indictment need not identify a

federal program by name or prove the receipt of federal benefits.
Id.

Fourth, the government argues that there is no legal
requirement that the indictment allege that federal funds were put
at risk.  Id. at pp. 10-13.  The government argues that the
prohibited conduct need only be related to a federal interest, and
that requirement is satisfied by the monetary thresholds in
section 666.  Id. at p. 12.  The government further contends that,
if it were necessary to allege that a defendant had authority over
federal funds, the indictment makes that allegation.  Id. at p. 13.

The Court once again finds that the indictment passes
muster.  The indictment sufficiently notifies the defendants of
the elements and circumstances of the crimes with which they are
charged.  The parties dispute the facts involved in whether the
government can prove an agency transaction and, therefore,
resolution of this issue is improper at this stage.  Stepanets,
879 F.3d at 372.  Additionally, the indictment is sufficient even
though it does not identify the source or nature of federal
benefits.  On both issues, the government need not lay out all its
evidence in the indictment, or prove its case, for the indictment
to be sufficient.  Rodríguez-Rivera, 918 F.3d at 35; Stepanets,
879 F.3d at 372; Stewart, 744 F.3d at 21.

The defendants' other two arguments—whether section 666 permits federal benefits to be aggregated to reach the $10,000 threshold, and whether section 666 requires federal funds be put at risk—raise legal issues.  As the Court reads the government's filings, the government does not dispute the ability of the Court to reach the arguments and does not dispute the pertinent facts. See Docket No. 131 at pp. 8-13.  But cf. id. at p. 4 (arguing that there is no legal basis to dismiss the federal program bribery charges "[b]ecause Counts Eight and Nine both allege the elements of a section 666 violation, and apprise the defendants of the nature of the offenses they face.")  Therefore, these two arguments can be addressed at this time.  Musso, 914 F.3d at 29-30; Del Valle-Fuentes, 143 F. Supp. 3d at 26-28.

The Court has not identified, and no party has put forward, controlling caselaw on whether section 666 permits federal benefits to be aggregated for purposes of meeting the $10,000 threshold.  The Court therefore interprets the statutory provision.

The text of the statutory provision arguably, but not determinatively, supports the defendants' position.  The provision states that the agency in question must "receive[], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance,

or other form of Federal assistance."  18 U.S.C. § 666(b).  By referring to benefits from "a" federal program, the provision may be interpreted as requiring the threshold to be met from at least one program on its own.

The Court, however, is not prepared to settle its view of congressional intent on such a thin reed without considering other indications of that intent.  "It is an age-old tenet of statutory interpretation that plain meaning sometimes must yield if its application would bring about results that are . . . antithetical to Congress's discernible intent."  United States v. Gordon, 875 F.3d 26, 34 (1st Cir. 2017) (alteration in original) (internal quotation marks omitted).

As the government points out, requiring the threshold to be met by a single federal program could exclude an agency that receives a large sum of federal benefits from many programs.  To ascertain whether such an outcome would be antithetical to congressional intent, the Court considers other indications of that intent.

The purpose of section 666 lends support to the government's view of the $10,000 threshold.  "The goal [of section 666] was to protect federal funds by authorizing federal prosecution of thefts and embezzlement from programs receiving substantial federal support . . . ."  United States v. Cicco, 938

F.2d 441, 445 (3d Cir. 1991).  Section 666 "is extremely broad in scope, as that statute seeks to ensure the integrity of vast quantities of federal funds previously unprotected due to a serious gap in the law."  United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007) (citation and internal quotation marks omitted).  The purpose of protecting federal benefits applies whether the substantial federal support comes through a single federal program or multiple programs.

The legislative history of section 666 also weighs toward the government.  A Senate report is the primary source of legislative history.  S. Rep. No. 98-225, at 369 (1984); see Cicco, 938 F.2d at 444-45.  The Senate report instructs,

> The Committee intends that the term "federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of federal assistance" be construed broadly, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery.

S. Rep. No. 98-225 at 370.  Interpreting section 666 to permit the $10,000 threshold to be met by the aggregation of benefits from federal programs constitutes a broad construction of the federal program term consistent with the expressed purpose of protecting vast sums of federal money.

Taken out of context, one aspect of the Senate report could support the defendants' interpretation of the $10,000

threshold.  The report states that the above-quoted language "is
not unlimited" and "[t]he term 'federal program' means that there
must exist a specific statutory scheme authorizing the federal
assistance in order to promote or achieve certain policy
objectives."  Id.  By calling for "a specific statutory scheme,"
one might think the legislators wanted the threshold to be met by
a single program.  Focusing on just that phrase, however, belies
the meaning of the limiting qualification.

        The "specific statutory scheme" sentence targets the
limits on the type of federal benefits that satisfy the threshold,
not a requirement that the benefits flow from a single program.
Not all federal funds disbursed under an assistance program count
towards the $10,000 threshold.  Fischer v. United States, 529 U.S.
667, 681 (2000).  "To determine whether an organization
participating in a federal assistance program receives 'benefits,'
an examination must be undertaken of the program's structure,
operation, and purpose."  Id.  As the Court reads the Senate
report, this is the limitation under discussion.  The subsequent
sentences in the report makes this clear:

> Thus, not every federal contract or disbursement of
> funds would be covered.  For example, if a government
> agency lawfully purchases more than $10,000 in equipment
> from a supplier, it is not the intent of this section to
> make a theft of $5,000 or more from the supplier a
> federal crime."

S. Rep. No. 98-225 at 370.

From a doctrinal perspective, the question of whether section 666 allows the aggregation of federal benefits to meet the $10,000 threshold appears mostly unsettled. The defendants point to no caselaw in support of their view. See Docket No. 68 at p. 6; Docket No. 85 at pp. 25-26. The government points to one case holding that aggregation is permitted to reach the $10,000 threshold. (Docket No. 131 at p. 8 (citing United States v. Kranovich, 244 F. Supp. 2d 1109, 1118 (D. Nev. 2003), overruled on other grounds, Sabri v. United States, 541 U.S. 600 (2004))). The Kranovich court observed that section 666's $5000 threshold for the value of a transaction can be met through aggregation, then likened the two monetary thresholds. Kranovich, 244 F. Supp. 2d at 1118. The government also notes that the First Circuit Court of Appeals held that the $5000 threshold can be met through aggregation. (Docket No. 131 at p. 9 (citing United States v. López-Cotto, 884 F.3d 1, 8 (1st Cir. 2018))).

The Court holds that section 666 permits federal benefits to be aggregated for purposes of meeting the $10,000 threshold. This holding is based on the purpose of section 666, a broad reading of the federal program language in service of that purpose, and the rationale espoused in Kranovich.

The Court also holds that section 666 does not require the government to allege that federal funds were put at risk. Section 666 does not require proof of a nexus between a bribe or kickback and some federal money. Bravo-Fernández, 722 F.3d at 10 (discussing Sabri, 541 U.S. at 605-06). The conduct regulated by section 666 need only be reasonably related to a federal interest. United States v. Bravo-Fernández, 756 F. Supp. 2d 184, 205 (D.P.R. 2010) (Besosa, J.) (discussing United States v. Lipscomb, 299 F.3d 303, 336-37 (5th Cir. 2002)).

## C.   Keleher's Motion to Dismiss Count One, to Strike a Portion of Count One, or for a Bill of Particulars

Keleher moves to dismiss an allegation in the honest services fraud conspiracy count against her, to strike the allegation, or for a bill of particulars. (Docket No. 67.) Keleher's motion relates to the August 21, 2018 e-mail from Individual A to Keleher and to a representative of Company E confirming that money should be disbursed to Company D. Id. According to Keleher, "the indictment fails to allege any involvement of Company D or Company E in the conspiracy alleged in Count One, or otherwise offer any explanation whatsoever as to how this e-mail could conceivably be in furtherance of the alleged conspiracy to commit wire fraud." Id. at p. 2. In a reply brief, Keleher argues that the e-mail "appears merely to be an attempt by

the Government to paint [Keleher] in an [*sic*] negative light, as someone who sought to enrich herself through public service." (Docket No. 158 at p. 5.)   Keleher argues that a bill of particulars is warranted should the Court not dismiss or strike the allegation "to provide information detailing any misrepresentations . . . [the government] alleges were made in the August 21st e-mail, when Companies D and E joined the conspiracy, what their role was in the conspiracy, and how the August 21st e-mail allegedly furthered the conspiracy." (Docket No. 67 at p. 7.) This information, Keleher contends, is necessary for her to prepare her defense adequately, and to avoid surprise.   Id. at p. 8.

        The government argues that none of Keleher's requested relief is appropriate.   (Docket No. 147.)   The government first contends that dismissal is not a proper relief for the issues Keleher raises.   Id. at p. 1.   The government then argues that striking allegations associated with the August 21 e-mail is unwarranted because Keleher has not shown that the e-mail is irrelevant, prejudicial, or inflammatory.   Id. at pp. 3-5.   The e-mail is relevant, the government contends, because it was part of an effort to obtain money for Company D, which Keleher hoped would fund her salary, and this effort is probative of Keleher's intent to use her position as Secretary of DOE to receive things of value in exchange for favorable action.   Id. at p. 4.   The government

rejects the need for a bill of particulars, stating that it need not establish that an e-mail contained misrepresentations to prove wire fraud, and that it need not show that a particular person joined the conspiracy to prove Keleher conspired to commit honest services fraud.  <u>Id.</u> at pp. 5-7.

The government is correct that dismissal is not the appropriate remedy for the arguments in Keleher's motion.  "[A] motion to strike surplusage, rather than a motion to dismiss indictment, is the proper vehicle to remedy prejudicial language contained in an indictment."  <u>United States v. Watson</u>, Crim. No. 08-32, 2008 WL 3256662, at *2 (M.D. Ga. Aug. 5, 2008).

"Upon the defendant's motion, the court may strike surplusage from the indictment or information."  Fed. R. Crim. P. 7(d).  "Rule 7(d) serves to protect the defendant against immaterial or irrelevant allegations in an indictment, . . . which may . . . be prejudicial."  <u>United States v. Berroa</u>, 856 F.3d 141, 157 (1st Cir. 2017) (alterations in original) (internal quotation marks omitted).  "Language in the indictment which is information the government, in good faith, intends to properly prove at trial cannot be stricken as surplusage, no matter how prejudicial it may be."  <u>United States v. Bravo-Fernández</u>, 792 F. Supp. 2d 172, 176 (D.P.R. 2011) (Besosa, J.) (internal quotation marks omitted).  "Because the standard to strike surplusage is so exacting, courts

have interpreted it narrowly and alleged surplusage is rarely stricken." Id. (internal quotation marks omitted).

The Court concludes that striking the allegations associated with the August 21 e-mail is not appropriate. The government intends to prove the allegations at trial. See Docket No. 147 at pp. 4-5. The relevance of the e-mail is sufficiently apparent insofar as the e-mail involves Individual A and Keleher, and is probative of Keleher's use of her position to enrich herself by soliciting things of value. See Docket No. 3 at p. 5.

Rule 7(f) of the Federal Rules of Criminal Procedure authorizes courts to direct a filing of a bill of particulars. Fed. R. Crim. P. 7(f). A defendant "uncertain as to the nature of the charges against him . . . [may] file a motion for a bill of particulars." United States v. Barbato, 471 F.2d 918, 921 (1st Cir. 1973).

"When pursued, [a motion for a bill of particulars] need be granted only if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause." United States v. Sepúlveda, 15 F.3d 1161, 1192-93 (1st Cir. 1993). "When deciding whether a requested . . . bill meets this standard, courts may consider the complexity of the crime charged, the clarity of the indictment,

and the degree of discovery and other sources of information otherwise available to the defendants." 1 Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure: Criminal § 130, at 658–59 (4th ed. 2008) [hereinafter Wright & Leipold]. Professor LaFave recommends consideration of "the nature of the offense involved, the nature of the events that serve as the basis for the charge, and the breadth of the pleading," as well as "the complexity of the offense, the range of activities it encompasses, and the time span it covers." 5 Wayne R. LaFave et al., Criminal Procedure § 19.4(b), at 365 (4th ed. 2015).

"[I]ndictments need not be infinitely specific." Sepúlveda, 15 F.3d at 1192. "When an indictment is sufficiently specific there is no need to grant a bill of particulars." United States v. Vázquez-Rijos, 250 F.R.D. 99, 100 (D.P.R. 2008) (Besosa, J.).

Courts refuse to grant motions for bills of particulars that are not necessary to prepare a defense, avoid surprise, or avoid double jeopardy. For instance, courts "deny a request for a bill if the information sought would simply be helpful to the defense rather than strictly necessary to a fair trial." Wright & Leipold, § 130, at 662–63; cf. United States v. Roy, 375 F.3d 21, 25 (1st Cir. 2004) (explaining that a defendant must show prejudice to succeed in an appellate challenge to the denial of a

motion for a bill of particulars).  And, "[m]ore broadly, no bill
is required if the government has provided the desired information
through pretrial discovery or in some other satisfactory manner."
Wright & Leipold, § 130, at 663–64.

        A bill of particulars is also not a discovery device.
It "is not an investigative tool for defense counsel 'to obtain a
detailed disclosure of the government's evidence prior to trial.'"
United States v. Rodríguez-Torres, 560 F. Supp. 2d 108, 111
(D.P.R. 2008) (García-Gregory, J.) (quoting United States v.
Kilrain, 566 F.2d 979, 985 (5th Cir. 1978)).  "[A] bill of
particulars may not call for evidentiary matter[,] . . . a
detailed preview of the government's trial evidence," or
disclosure of the government's legal theory or legal conclusions.
Wright & Leipold, § 130, at 668–71.

        A bill of particulars is unnecessary here to a fair
trial.  The indictment alleges that the August 21 e-mail furthered
the conspiracy. (Docket No. 3 at p. 8.)  The indictment identifies
the sender, recipient, and content of the e-mail.  Id.  The e-mail
itself, along with other related e-mails, have been provided to
Keleher through discovery.  See Docket No. 147 at p. 4.  Moreover,
the honest services fraud conspiracy charge is not overly complex
and its time-span is alleged to be roughly one year. (Docket No. 3
at p. 5.)

### D. **Gutiérrez's Motion to Dismiss Counts Three, Five, and Seven**

Gutiérrez moves to dismiss three wire fraud charges based on three e-mails. (Docket No. 58.) On June 22, 2018, Gutiérrez e-mailed Keleher "regarding Company C's request to acquire land of the Padre Rufo School." (Docket No. 3 at p. 9.) On July 17, 2018, Gutiérrez e-mailed Keleher "attaching documents relating to Company C's acquisition of 1,034 square feet of the Padre Rufo School." Id. On August 20, 2018, Gutiérrez e-mailed Keleher "offering assistance in obtaining a bank loan." Id. at p. 10.

Gutiérrez observes that the communications which form the basis of those charges postdate Keleher's signing of the Ciudadela lease on June 7, 2018. Id. at p. 1. Characterizing June 7 as the completion date of the scheme alleged in the indictment, Gutiérrez argues that the communications could not have been made in furtherance of a completed scheme. Id. at pp. 1-2.

The government opposes the motion. (Docket No. 140.) The government argues that the indictment adequately alleges that the communications were in furtherance of the scheme. Id. at pp. 5-8. Additionally, according to the government, whether the communications were in furtherance of the alleged scheme is a

question to be resolved after trial by a jury or in a Rule 29
motion, not on a motion to dismiss the indictment.  Id. at pp. 3-
5.  The government also disputes Gutiérrez's position that the
scheme ended on June 7, 2018.  Id. at p. 7 n.1.

 The crime of wire fraud requires, among other things,
that a defendant "use the . . . [wires] for the purpose, or in
furtherance, of executing the scheme to defraud."  United States
v. Hebshie, 549 F.3d 30, 36 (1st Cir. 2008) (emphasis in original);
see also Medina-Rodríguez v. $3,072,266.59 in United States
Currency, Civ. No. 19-1236, 2020 WL 3868431, at *8 n.9 (D.P.R.
July 9, 2020) (Besosa, J.) (citing Carpenter v. United States, 484
U.S. 19, 25 n.6 (1987)) (alteration in original) (explaining that
the similarity in relevant language among wire fraud and mail fraud
leads the Court to apply the same analysis).

> The "in furtherance" requirement is to be broadly read
> and applied.  To further Defendant's fraudulent scheme,
> the mailings need not be an "essential element" of the
> scheme.  They simply must be "sufficiently closely
> related" to the scheme, such that they are "incident to
> an essential part of the scheme," or "a step in [the]
> plot."  Although we have observed that "the scheme's
> completion or the prevention of its detection must have
> depended in some way on the mailings," we have not
> required a "but-for" link between a mailing and the
> fraudulent scheme.  Rather, a mere "connection or
> relationship" is sufficient.  "The relevant question at
> all times is whether the mailing is part of the execution
> of the scheme as conceived by the perpetrator at the
> time, regardless of whether the mailing later, through
> hindsight, may prove to have been counterproductive and
> return to haunt the perpetrator of the fraud."

Hebshie, 549 F.3d at 36 (alteration in original) (citations omitted).   The First Circuit Court of Appeals has further identified two propositions: "First, a mailing can serve as the basis for a mail fraud conviction even if the fraud would have been successful had the mailing never occurred.   Second, however, that mailing—even if dispensable—must at least have some tendency to facilitate execution of the fraud."   United States v. Tavares, 844 F.3d 46, 59 (1st Cir. 2016).

Whether a scheme has reached fruition before a wire is sent is relevant to determining if the communication can support a charge of wire fraud.   For example, in United States v. Pacheco-Ortiz, 889 F.2d 301, 306 (1st Cir. 1989), the court stated that a mailing did not support a charge of mail fraud "in large part because it was made after the cultivators had enjoyed the fruits of the scheme and in no way furthered the execution of that scheme as conceived by the principal."

The time of fruition, however, is not necessarily when money changes hands.   For instance, in United States v. Sampson, 371 U.S. 75, 80-81 (1962), the scheme called for mailings to be sent out after victims' money was obtained.   The mailings were sent "for the purpose of lulling . . . [the victims] by assurances that the promised services would be performed."   Id. at 81.   The

Court held that a district court erred in dismissing mail fraud
counts based on those mailings.  Id.

        Additionally, where a continued relationship is of
consequence to a scheme, mailings which maintain that relationship
may form the basis of a mail fraud charge.  See Tavares, 844 F.3d
at 60-61.  For example, in United States v. Woodward, 149 F.3d 46,
52 (1st Cir. 1998), the government introduced evidence that a
lobbyist paid for meals and entertainment of a state legislator.
The legislator was charged with mail fraud arising from credit
card bills sent to the lobbyist.  Id. at 64-65.  The legislator
argued that the mailings were a result of the scheme but not for
the purpose of executing it.  Id.  The Woodward court refused to
view each instance in which the lobbyist paid the bills as a
separate scheme, instead viewing them as part of a larger scheme.
Id.

        In any event, the timing of events is not the most
important consideration.  Rather, the Court's inquiry is whether
the wiring is made for the purpose of executing or hiding a scheme.
See, e.g., Hebshie, 549 F.3d at 36; United States v. Sidoo, Crim.
No. 19-10080, 2020 WL 3893053, at *4 (D. Mass. July 10, 2020).

        The government has properly alleged the "in furtherance"
element of wire fraud.  Gutiérrez has sufficient notice of the "in
furtherance" element of the wire fraud crimes with which he is

charged.  <u>Resendiz-Ponce</u>, 549 U.S. at 108; <u>Hamling</u>, 418 U.S. at
117; <u>Rodríguez-Rivera</u>, 918 F.3d 32, 34; <u>Stepanets</u>, 879 F.3d at
372; <u>Sepúlveda</u>, 15 F.3d at 1192.  The parties dispute when the
scheme came to fruition, <u>compare</u> Docket No. 58 at pp. 1–2
(asserting that alleged scheme came to fruition on June 7, 2018),
<u>with</u> Docket No. 140 at p. 7 n.1 (rejecting assertion that scheme
ended on June 7, 2018), <u>and</u> Docket No. 3 at p. 5 (alleging that
the conspiracy to commit honest services fraud occurred "[f]rom in
or about May 2018 until in or about May 2019"), and resolution of
a motion to dismiss is improper where there is a factual dispute,
<u>Stepanets</u>, 879 F.3d at 372.  Contrary to Gutiérrez's contention,
whether the communications were in furtherance of the scheme is a
question of fact for the jury.  <u>See, e.g.</u>, <u>United States v. Castor</u>,
558 F.2d 379, 384–85 (7th Cir. 1977) (rejecting propriety of
dismissal of mail fraud indictment based on the "in furtherance"
element, and holding dismissal unwarranted unless there is no
conceivable evidence that the government could produce at trial to
substantiate its "in furtherance" allegation); <u>United States v.</u>
<u>Brennan</u>, 938 F. Supp. 1111, 1128–29 (E.D.N.Y. 1996) (refusing to
dismiss indictment for mail fraud where a jury could find an
ongoing scheme), <u>reversed on other grounds</u>, 183 F.3d 139, 141 (2d
Cir. 1999).

### E.  Gutiérrez's Motion to Dismiss Counts One, Three, Five, and Seven

Gutiérrez moves to dismiss the honest services fraud conspiracy and wire fraud counts against him. (Docket No. 59.) First, Gutiérrez argues that the indictment does not sufficiently allege the fraudulent scheme. Id. at pp. 12–14. Second, Gutiérrez argues that the indictment is fatally deficient because it fails to state, and fails to provide facts supporting, that the scheme was conducted by means of false pretenses.  Id. at pp. 14–19. Third, Gutiérrez argues that the indictment does not sufficiently allege that there was a material false statement.  Id. at pp. 19–21.  Fourth, Gutiérrez argues that the indictment does not include an express or implied allegation that any representations or concealments were made with the intent to defraud.  Id. at pp. 21–24.  Finally, Gutiérrez argues that the indictment does not adequately identify the honest services owed by Keleher.  Id. at pp. 24–31.  Gutiérrez both suggests that the honest services must be defined by state law and notes that the indictment does not specify if any services were owed under a federal statute.  Id.

The government opposes Gutiérrez's motion. (Docket No. 144.)  The government argues that the indictment adequately alleges the scheme to defraud.  Id. at pp. 4–7, 10–14.  The government also argues that there is no legal requirement for the

indictment to allege false and fraudulent pretenses.  Id. at pp. 7–
10.  Additionally, the government argues that the indictment
alleges materiality and a specific intent to defraud irrespective
of any absence of magic words.  Id. at pp. 14–18.  Finally, the
government argues the honest services owed by Keleher arise by
virtue of her fiduciary duty to the public and that no state law
violation need be alleged.  Id. at pp. 18–22.

     First, Gutiérrez errs in seeking to dismiss the
indictment for a purported failure sufficiently to allege the
scheme to defraud.  "A scheme or artifice to defraud is defined to
include any plan, pattern or [course] of action . . . intended to
deceive others in order to obtain something of value."  United
States v. Colón-Muñoz, 192 F.3d 210, 221 (1st Cir. 1999)
(alterations in original) (internal quotation marks omitted).
"[T]hose who bribe public officials take part in a scheme to
deprive the public of the honest services of those they attempt to
influence."  United States v. Urciuoli, 613 F.3d 11, 17 (1st Cir.
2010); see also United States v. Hawkins, 777 F.3d 880, 883–84
(7th Cir. 2015) (emphasis in original) ("A plan to take money in
exchange for an official act constitutes a scheme to defraud,
whether or not the plan succeeds."); United States v. Ciavarella,
716 F.3d 705, 729 (3d Cir. 2013) ("[E]vidence of bribery or
kickbacks . . . may be relevant to proof of a scheme to defraud

under a bribery-and-kickback theory of honest services fraud.”).
Courts have found that an indictment adequately alleges a bribery
theory of honest services fraud where the indictment describes the
bribe and official act.  See, e.g., United States v. Kemp, 500
F.3d 257, 280-81 (3d Cir. 2007); United States v. Avenatti, 432
F. Supp. 3d 354, 365 (S.D.N.Y. 2020).

        The indictment plainly alleges the bribe and official
act.  According to the indictment, Gutiérrez facilitated Keleher’s
receipt of financial benefits in exchange for signing a letter
purporting to cede the Padre Rufo School land to Company C.
(Docket No. 3 at p. 6.)  The indictment explains that Keleher did
not disclose the financial benefits.  Id. at p. 4.  The indictment
also identifies the manner and means of the conspiracy and its
overt acts, including the e-mails giving rise to the wire fraud
charges.  Id. at pp. 5-10.  That is sufficient.

        Gutiérrez is also wrong to argue that the indictment is
deficient for failing to allege that the scheme was conducted by
false pretenses.  Wire fraud may be committed by a person who has
sent a wire “having devised or intending to devise any scheme or
artifice to defraud, or for obtaining money or property by means
of false or fraudulent pretenses, representations, or
promises . . . for the purpose of executing such scheme or
artifice.”  18 U.S.C. § 1343.  The phrase “for obtaining money or

property by means of false or fraudulent pretenses, representations, or promises" "modifies the first [phrase] by ma[king] it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." Cleveland v. United States, 531 U.S. 12, 26 (2000) (second alteration in original) (internal quotation marks omitted). As such, "the disjunctive phrases in § 1341 proscribe a single offense and . . . the second phrase merely describes one type of fraudulent scheme." United States v. Zar, 790 F.3d 1036, 1050 (10th Cir. 2015); see also United States v. Finazzo, 850 F.3d 94, 106 (2d Cir. 2017) ("[T]he statute is interpreted to criminalize any scheme or artifice for obtaining money or property."); United States v. Hedaithy, 392 F.3d 580, 602 (3d Cir. 2004) (alterations omitted) (emphasis in original) (internal quotation marks omitted) ("The mail fraud statute was . . . intended to cover any scheme or artifice to defraud one of his money or property . . . including any scheme for obtaining money or property by means of false or fraudulent promises.").

Therefore, the indictment passes muster by alleging the scheme to defraud. An omission of one type of fraudulent scheme does not warrant dismissal.

Third, Gutiérrez's argument about the lack of sufficient allegations on materiality fails. Materiality is an element of

honest services fraud.  Neder v. United States, 527 U.S. 1, 25

(1999).   An allegation of a scheme or artifice to defraud

incorporates materiality.  United States v. Klein, 476 F.3d 111,

113-14 (2d Cir. 2007); United States v. Culligan, Crim. No. 04-

305, 2007 WL 3232484, at *1-3 (W.D.N.Y. Nov. 1, 2007).  As noted

above, the indictment in this case alleges a scheme or artifice to

defraud.  (Docket No. 3 at pp. 5-10.)

          Gutiérrez's argument concerning the indictment's

allegations on specific intent also falls short.  The allegations

in the indictment allege specific intent.  "[A] bribery-like,

corrupt intent to influence official action necessarily is an

intent to deprive the public of an official's honest services."

Woodward, 149 F.3d at 55 (quoting United States v. Sawyer, 85 F.3d

713, 730 (1st Cir. 1996)).  Whether the indictment incants specific

words is not determinative, as scienter elements may be alleged

implicitly.  See, e.g., United States v. McLennan, 672 F.2d 239,

242 (1st Cir. 1982).

          Finally, the Court disagrees with Gutiérrez that the

indictment does not adequately identify the honest services owed

by Keleher.  The indictment alleges that Keleher was a public

official.  (Docket No. 3 at p. 1.)  Thus, Keleher had a fiduciary

duty to the public.  See Skilling v. United States, 561 U.S. 358,

407 n.41 (2010).  Accepting a bribe would breach that duty and

infringe on the public's right to honest services.  And, in light
of that fiduciary duty, there is no need for the government to
ground its case in the violation of a state law.  <u>Sawyer</u>, 239 F.3d
at 41–42.

## IV.  Conclusion

For the reasons discussed above, the defendants' motions,
(Docket Nos. 57–59, 67–69, 85,) are **DENIED**.

**IT IS SO ORDERED**.

San Juan, Puerto Rico, December 1, 2020.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE